**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No. 3:20-CV-287-FDW-DCK**

| | |
|---|---|
| PCT, LTD and Paradigm Convergence Technologies Corporation, | |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT** |
| Marion E. Paris, Jr., Clay Parker Sipes, and Annihilare Medical Systems, Inc., | |
| Defendants and Third-Party Plaintiffs, | |
| v. | |
| Darryl Leslie Patterson, | |
| Third-Party Defendant. | |

Plaintiffs PCT, LTD ("PCT") and Paradigm Convergence Technologies, Corporation ("PCT Corp") (collectively "Plaintiffs"), by and through their attorneys, Bond Schoeneck & King, PLLC, as and for their First Amended Complaint against defendants Marion E. Paris, Jr. ("Mr. Paris"), Clay Parker Sipes ("Mr. Sipes") and Annihilare Medical Systems, Inc. ("Annihilare") (collectively "Defendants"), herein allege as follows:

## NATURE OF ACTION

1.      This lawsuit arises out of unfair competition and deceptive business practices on the part of Defendants which were undertaken for the purpose of effectively stealing certain of Plaintiffs' valuable intellectual property and other confidential and trade secret information in order to develop and significantly profit from products – the Healthcare Infection Prevention System ("HIPS"), AoS 500, and AnniList (the "Accused Products") – that are nearly identical to,

infringe upon certain patents and a trademark relating to, and are now in direct competition with Plaintiffs' Annihilyzer product.

2.      Such wrongful and unlawful conduct on the part of Defendants has caused – and is continuing to cause – significant harm not only to Plaintiffs, their business generally, and position in this unique market segment, but also consumers everywhere, North Carolina included, as they are being deprived of potentially life-saving technology to stop the spread of the virus that causes Covid-19 and other contagions.

## PARTIES

3.      PCT is incorporated under the laws of Nevada with its principal place of business located at 4235 Commerce Street, Little River, South Carolina 29566.

4.      PCT Corp. is a wholly owned subsidiary of PCT, is incorporated under the laws of Nevada, and has its principal place of business located at 4235 Commerce Street, Little River, South Carolina 29566.  PCT Corp. uses and incorporates certain intellectual property owned by PCT into PCT Corp.'s products, including the Annihilyzer.

5.      PCT Corp. is an industry leading technology company that develops, manufactures, and sells or licenses myriad products and technologies designed to eliminate contamination from and/or disinfect, among other things, water supplies, industrial fluids, hard surfaces, food processing equipment, and medical devices.

6.      One such product, the Annihilyzer, produces a hypochlorous acid disinfectant solution in a convenient on-site dispensing system for hospitals, health clinics, and other industries. The disinfectant is not only more effective than bleach cleaners, it can be used in the presence of patients without any harmful effects. However, the disinfectant also has a naturally

2

occurring and relatively short life cycle. To address this issue, the Annihilyzer uses a tracking system which allows users to conveniently scan bottle labels to determine, among other things, where the disinfectant is in the life cycle, whether the solution needs to be replaced, what room is being cleaned and at what time, what protocols are used in the cleaning process, and so on.

7. The Annihilyzer technology, and the product itself, is incredibly valuable not only to Plaintiffs, but also to hospitals, health clinics, and healthcare providers everywhere, who are on the frontlines of the ongoing war against the virus that causes Covid-19 and other contagions and therefore need to ensure that such contagions cannot survive on surfaces and spread to patients and healthcare workers alike.

8. Upon information and belief, Mr. Paris is an individual residing at 3360 Maiden Highway, Lincolnton, North Carolina 28092. Mr. Paris is a former employee of PCT and, upon information and belief, a principal and officer of Annihilare.

9. Upon information and belief, Mr. Sipes is an individual residing at 444 Old Lincolnton Crouse Road, Lincolnton, North Carolina 28092. Mr. Sipes is a former employee of PCT Corp. and, upon information and belief, a principal and officer of Annihilare.

10. Upon information and belief, Annihilare was incorporated under the laws of Texas on October 13, 2015 and has a principal place of business located at 15720 Brixham Hill Avenue, Suite 300, Charlotte, North Carolina 28277.

11. Annihilare is now a direct competitor of Plaintiffs by virtue of certain unfair competitive activities and deceptive conduct, including the misappropriation and use of certain intellectual property, other confidential and trade secret information, and certain domain names belonging to Plaintiffs (all as described herein), which Annihilare knowingly and willingly used

3

to develop, market and sell a competing – and infringing – hypochlorous acid disinfectant dispensing and tracking systems – the Accused Products – with nearly identical capabilities and features to the Annihilyzer, all as explained herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 for Defendants' willful infringement of PCT's patents and the ANNIHILYZER trademark (35 U.S.C. §§ 271, 281 and 283-285 and 15 U.S.C. §§ 1114 and 1125).

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based on Defendants' violations of the Defend Trade Secrets Act (18 U.S.C. §§ 1831-1839) and the Federal Cybersquatting Act (15 U.S.C. § 1125(d)).

14.     This Court has supplemental jurisdiction over all state law claims asserted herein pursuant to 28 U.S.C. § 1367, as they all relate to the above federal claims.

15.     In addition, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on complete diversity of the parties and an amount in controversy in excess of $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Mr. Paris and Mr. Sipes on the basis of their respective residences in the State of North Carolina, and Annihilare on the basis of its principal place of business in the State of North Carolina.

17.     Venue is proper in this Court pursuant to 18 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this lawsuit occurred in this District, and 28 U.S.C. § 1400, as Defendants have committed acts of patent infringement in this District and reside and/or have a regular and established place of business in this District.

## GENERAL ALLEGATIONS

### A. PCT Acquires the Annihilyzer Intellectual Property.

18.     On February 1, 2016, PCT Corp. entered into a Consulting Agreement with Mr. Paris (the "First Consulting Agreement") to govern the development of the Annihilyzer, whereby Mr. Paris agreed to provide certain consulting services with respect to the development of the Annihilyzer and the Annihilyzer business for Plaintiffs.

19.      Pursuant to the terms of the First Consulting Agreement, PCT Corp. paid Mr. Paris $6,000 per month for services until a June 30, 2016 termination date.

20.     Among other things, the First Consulting Agreement provided that all intellectual property, documents and information made or conceived by PCT Corp.'s employees as part of their work with Mr. Paris was the exclusive property of PCT Corp.

21.     PCT Corp. and Mr. Paris entered into a second Consulting Agreement on July 1, 2016 (the "Second Consulting Agreement"), with a termination date of November 30, 2016.  The material terms of the Second Consulting Agreement were identical in all respects to the First Consulting Agreement, save for the extended time period.

22.     Upon information and belief Mr. Paris incorporated the entity Annihilyzer, Inc. during the course of the First Consulting Agreement for the purpose of owning the intellectual property he jointly developed under the consulting agreements with PCT Corp.

23.     Plaintiffs' and Mr. Paris's work pursuant to the First and Second Consulting Agreements resulted in the development of certain valuable intellectual property concerning the Annihilyzer system, including, without limitation, the tracking system and the software created to run the system (the "Material Tracking System"), the ANNIHILYZER Trademark, pending

patents in the United States and Canada with respect to the Annihilyzer, and all the know-how and goodwill relating to the above.

24.     As such, on November 29, 2016, Bingham Canyon Corporation, which has since changed its name to PCT, entered into an agreement (the "Purchase Agreement") with Mr. Paris's company, Annihilyzer, Inc., to purchase all of the intellectual property owned by Annihilyzer, Inc. relating to the Annihilyzer (the "AIP").    A true and accurate copy of the Purchase Agreement is annexed hereto as **Exhibit A**.

25.     Pursuant to the Purchase Agreement, PCT purchased the entirety of the AIP, including, without limitation, the following:

      a.   software related to the Material Tracking System;

      b.   two AIP Kiosks;

      c.   the Trademark for the ANNIHILYZER;

      d.   US Utility Application for the Material Tracking System;

      e.   the Provisional Application Number 62/412,549 received by the United States Patent Office on or about October 25, 2016 for the Material Tracking System;

      f.   Canadian Patent Application NO. 1,915,815 filed with the Canadian Intellectual Property Office;

      g.   all knowhow and processes involved with the operation of the AIP system; and

      h.   all goodwill and market knowledge concerning the AIP.

26.     The Purchase Agreement was subsequently amended on April 6, 2020 to, among other things, change the purchase price to 2,250,000 shares of common stock of PCT and the

closing date for the purchase of the AIP to April 6, 2020.  A true and accurate copy of the subject amendment is annexed hereto as **Exhibit B**.

27.  Pursuant to the Purchase Agreement and its amendment, PCT delivered 2,250,000 shares of common stock in PCT to Annihilyzer Inc. in consideration for, among other things, the AIP.

28.  The Purchase Agreement closed on April 6, 2017, at which time PCT became the sole and exclusive owner of the entirety of the above-described AIP.

29.  At this time PCT became owner of the ANNIHILYZER, U.S. Trademark Reg. No. 4521689, with a registration date of April 29, 2014. A printout of the ANNIHILYZER trademark from the U.S. Trademark Office website is annexed hereto as **Exhibit C**.

30.  Plaintiffs have offered and sold goods and services in this District bearing the Mark ANNIHILYZER, and have continuously used the ANNIHILYZER Mark and diligently monitored the ANNIHILYZER Mark to enforce against infringers.

31.  In order to further protect its investment in the AIP, PCT applied for and obtained numerous patents directed to tracking and monitoring its hypochlorous acid disinfectant solution. For example, PCT's tracking-related patents include U.S. Patent Nos.:  9,679,170 B2 (the "'170 patent"), and 10,521,765 B2 (the "'765 patent").

32.  U.S. Patent 9,679,170 B2 (the "'170 Patent"), titled Material Tracking System, was duly and legally issued by the United States Patent and Trademark Office on June 13, 2017. PCT is the assignee and owner of all right, title and interest in the '170 Patent, a true and accurate copy of which is annexed hereto as **Exhibit D**.

7

33.     U.S. Patent No. 10,521,765 B2 (the "'765 Patent"), titled Material Tracking System, was duly and legally issued by the United States Patent and Trademark Office on December 31, 2019.  PCT is the assignee and owner of all right, title and interest in the '765 Patent, a true and accurate copy of which is annexed hereto as **Exhibit E**.

   **B. <u>PCT Agrees to Employ Messrs. Paris and Sipes to Assist with Further Enhancements to, and the Marketing and Sale of, the Annihilyzer.</u>**

34.     PCT Corp. hired Mr. Sipes on January 1, 2017 in a business development, sales and marketing role for PCT Corp. generally and the Annihilyzer specifically.

35.     PCT subsequently hired Mr. Paris on September 1, 2017 in a management position with broad responsibility for and over, among other things, technological developments for products in the healthcare industry, including, without limitation, the ongoing enhancements to, and marketing and sale of, the Annihilyzer.

36.     The terms of Mr. Paris's employment with PCT were set forth in an Employment Agreement entered into between the parties on September 1, 2017.

37.     Pursuant to the terms of the Employment Agreement, PCT agreed to employ Mr. Paris for a 5-year term with a base salary of $90,000 per year, plus certain additional valuable benefits and a $40,000 signing bonus paid in 2 equal installments.

38.     In exchange for the 5-year employment term at the rate of pay noted above, Mr. Paris agreed that he would "faithfully serve" PCT and "devote the whole of his time and attention during business hours to the business of [PCT]."

39.     Mr. Paris further agreed that he would not engage in any other business while employed by PCT, with the sole exception being that he could remain CEO/President of "Annihilare, Inc." (**not** of Defendant Annihilare Medical Systems, Inc.), provided, of course, that

his position with "Annihilare, Inc." did not interfere with or obstruct his ability to perform his duties and responsibilities to PCT, including, among others, his contractual obligation to at all times faithfully serve PCT.

40.     Given Mr. Paris's significant role at PCT and the access he was to be granted to certain of Plaintiffs' highly confidential and trade secret information, PCT required that Mr. Paris agree to certain reasonable and necessary confidentiality obligations as a condition of his employment.

41.     Specifically, Mr. Paris agreed, as an express condition of his employment with PCT, that he would "not, either during the term of his employment with [PCT] or any time thereafter, disclose or cause to be disclosed, to any person or entity whatsoever …, any secrets or confidential information concerning the technical trade secrets, business, affairs or financial performance or position of [PCT]."

42.     The confidential and trade secret information to which Paris was granted access as part of his job responsibilities for Plaintiffs includes, without limitation, the following, all of which will be referred to collectively herein as the "Confidential Information":

        a.      The original AIP, including all know how and processes involved with the operation of the Annihilyzer and all goodwill and market knowledge concerning the same, as described in the Purchase Agreement;

        b.      Proprietary enhancements to the AIP, including all data, architecture, and other information relating to the enhanced protocols, reporting generators and software for the AIP and Material Tracking System, as explained herein;

9

c.      Specifications, diagrams and other technical information concerning current and future products and technologies, including, without limitation, those pertaining to the AIP, the Material Tracking System, the Annihilyzer, and other projects and technologies in development for Plaintiffs;

d.      Marketing and business plans and strategies for, among other things, the targeting of and/or sales to certain market segments, prospective customers and distributors, including sales pipeline updates and reports, including, but not limited to, those which relate to the AIP, the Material Tracking System and the Annihilyzer;

e.      Customer information, including customer requirements, customer-specific pricing, including margins and formulation information, contracts with certain customers, including pricing, duration and services/products to be provided, contact information, and sales proposals to and negotiations with prospective customers, including, but not limited to, with respect to the AIP, Material Tracking System and the Annihilyzer;

f.      Pricing formulations and margin information, including, but not limited to, those which relate to the AIP, Material Tracking System and the Annihilyzer;

g.      Sales production forecasts and other customer lists, which contain, among other things, names of current and prospective customers, customer-specific pricing, customer size, and customer requirements, including, but not limited to, those which relate to the AIP, the Material Tracking System and the Annihilyzer; and

h.      Myriad customer and product information contained on Plaintiffs' proprietary Annihilyzer System database, which contains, among other things, very specific information concerning customers, such as hospital names, location, hospital Environmental

Services ("EVS") Directors names, EVS supervisor names, EVS housekeeping employees names, daily cleaning and disinfecting protocols, standard discharge cleaning and disinfecting protocols, terminal cleaning and disinfecting protocols, hospital area location, patient room numbers, all radio-frequency identification ("RFID") bottles registered at each location, all registered handheld devices at each location, serial number and name of each hypochlorous acid generator at each location.In addition to the confidentiality covenant in his Employment Agreement, Mr. Paris, as well as the other employees of Plaintiffs, Mr. Sipes included, received and/or acknowledged certain confidentiality obligations, as contained in PCT Corp.'s Employee Handbook, which included, without limitation, the obligation to keep any and all company information he/they accessed and obtained "in strict confidence."

43.    Like Mr. Paris, Mr. Sipes was granted access to certain of the Confidential Information, including, without limitation, information relating to the AIP, proprietary enhancements to the AIP, customer information and lists, proposals and contracts (*see, supra,* at ¶ 42), as part of his business development and sales responsibilities regarding the Annihilyzer.

44.    Through the use of confidentiality agreements, like the one described above, a strict confidentiality policy for all employees, and through other company policies and actions, including, without limitation, restricting access to Confidential Information to employees on a need-to-know basis consistent with their job responsibilities, assigning unique log-in credentials to employees with access to Confidential Information, providing and maintaining control over laptops assigned to employees, and limiting access to cloud-based accounts to those maintained and controlled by Plaintiffs and the vendors they engage for that purpose, Plaintiffs have taken reasonable and appropriate measures to protect the Confidential Information.

11

45.     The reason Plaintiffs have taken these myriad measures to protect the Confidential Information is that the Confidential Information is not generally known to, and could not be readily ascertained by, the public or others in Plaintiffs' industry, and the continued secrecy of such information provides significant commercial value, as any disclosure or use of such information for competitive purposes would irreparably harm Plaintiffs' business generally and the significant investment of time and money made by Plaintiffs in acquiring and/or developing both the Confidential Information and the products in which such information is incorporated and/or used.

46.     In their respective roles for and on behalf of Plaintiffs, Mr. Paris and Mr. Sipes, along with other key employees of Plaintiffs within the medical technology division (including Darryl Patterson, PCT's Director of Healthcare Products, and Ronnie Syverson, PCT's Director of Infection Prevention, and others at PCT), began work on enhancing the protocols and software for the Annihilyzer's Material Tracking System to make it more efficient, user-friendly, and enhance its features and capabilities.

47.     Plaintiffs began working in earnest on updates to the Material Tracking System on or about May 1, 2017; Mr. Sipes was part of the team developing the enhancements.

48.     Mr. Sipes subsequently resigned his employment with PCT Corp. in January of 2018 and took a position with, and became a principal of, Annihilare.

49.     The PCT team, Mr. Paris included, continued to develop the protocol and software enhancements to the Annihilyzer's Material Tracking System throughout 2018, which included, without limitation, developing a mobile platform in late summer of 2018.

50.     PCT retained Prime ITS, Inc. ("Prime ITS") on July 10, 2018 to assist PCT in developing the mobile software platform for the Material Tracking System.  Mr. Paris, on behalf of PCT, approved the software order and scope of work for Prime ITS.

51.     Prime ITS was already providing web hosting and other information technology services for and on behalf of Plaintiffs beginning in early 2018 and continuing until approximately August 2019 when the relationship was terminated.

52.     Beginning in or around July of 2018, PCT started work on implementing certain material, and highly valuable, enhancements to the tracking protocols for the Annihilyzer's Material Tracking System, which, until that time, were limited to scanning the bottles of the disinfectant solution to determine where it was in its limited life cycle, along with basic room and protocol tracking. These enhancements to the tracking protocols allow for faster reporting to users at hospitals, clinics, and related businesses who "check-in" at a specific room to better ensure that the proper cleaning procedures are being done, including by logging what was and was not cleaned, when it was done and for how long, what protocols were followed, and the like, and determine whether the fluid is in its most effective state in the life cycle when used.

53.     PCT further sought to enhance the reporting generators for its Material Tracking System to allow its users to effectively generate reports in a more user-friendly format to determine what was done, where, by whom, at what time, and the like.

54.     These enhancements to the Material Tracking System required a significant investment of resources, including in developing the underlying data, architecture and other related information, and were developed in confidence by trusted employees of Plaintiffs subject to confidentiality restrictions and/or policies.

55.     These enhancements to the Material Tracking System also required further updates to the existing software package for the Annihilyzer.

56.     PCT entrusted Mr. Paris to assist with updating the software to run the enhanced protocols for the Material Tracking System.

57.     The software ultimately developed to run the enhanced protocols included, *inter alia*, a mobile check-in application and cloud-based reporting so that managers could access the room-based data for follow-up inspection, daily records of cleaning routines, and a variety of summary reports for analysis and planning. This software is an integral part of the Annihilyzer's Material Tracking System, as the user cannot use the enhanced tracking protocols without access to and use of the mobile application.

58.     The enhanced tracking protocols and reporting generators, including the updated software platform to run the protocols and generators, were completed on or about March 11, 2019. These improvements were to be incorporated into and become part of the Annihilyzer product, which would then be marketed and sold to hospital, healthcare, and other businesses. However, the new enhanced software was never transferred to the Annihilyzer, as intended, and was instead developed by Defendants, through the unauthorized disclosure and use of certain of the Confidential Information, for Annihilare's own platform – AnniList – to the exclusion of PCT.

**C.** **Defendants Misappropriate Certain of the Confidential Information and Certain Domain Names to Unlawfully Compete Against Plaintiffs and Infringe Upon Certain of PCT's Patents and its ANNIHILYZER Trademark.**

59.     In anticipation of the roll-out of the Annihilyzer product with the new tracking protocols and related software, Plaintiffs began work on both identifying and acquiring certain PCT-related web domain names and updating its existing website.

60.     To that end, in June 2018, at the request and on behalf of Plaintiffs, Mr. Paris began working on significant updates to Plaintiffs' existing website.  The initial updates to the website were completed by the PCT team, Mr. Paris included, in or around August of 2018.

61.     In June of 2018, at the request and on behalf of PCT, Mr. Paris purchased the domain "www.pcthealth.com" for PCT.  The website went live in August of 2018.

62.     Notwithstanding his authority to use, and his past practice in using, a PCT corporate credit card to make purchases on behalf of PCT, Mr. Paris claimed that he used his "personal credit card" to purchase the www.pcthealth.com domain name.

63.     When PCT attempted to reimburse Mr. Paris for the purchase of the domain name, Mr. Paris advised that there was no need because Prime ITS – the company that PCT had previously retained to help design the website for PCT – had already arranged to charge the cost of acquiring the domain back to PCT.

64.     Upon information and belief, Prime ITS invoiced PCT for the acquisition of the www.pcthealth.com domain name on August 20, 2018. PCT remitted payment for that entire August 20, 2018 invoice, including a payment for the subject domain name.

65.     At all times between August of 2018 when the www.pcthealth.com website went live and January 1, 2020 when PCT discovered that Defendants took possession of the website, PCT used and treated the website as its own.

66.     Later in 2018 and again in 2019, Mr. Paris also acquired on behalf of PCT the similar domain names of www.pcthealth.net and www.pcthealth.org.

67.     Mr. Paris tendered his resignation from PCT effective July 31, 2019.

68.     Soon thereafter, in early August 2019, Plaintiffs learned that its customers had lost access to the software platform necessary for use of the Annihilyzer product.

69.     Plaintiffs were advised at this time by Annihilare – Messrs. Paris's and Sipes' company – that the software platform developed for the Annihilyzer was purportedly owned by Annihilare. Incredibly, Annihilare advised Plaintiffs that they and their customers could not use the software unless Plaintiffs agreed to enter into a license agreement with Annihilare, thus taking the position that Plaintiffs must pay again for technology they acquired in 2016 and, since that time, had heavily invested in by both employing Messrs. Paris and Sipes and relying on other of their key employees to develop enhancements to the Material Tracking System and its related software.

70.     Annihilare has effectively held Plaintiffs and Annihilyzer clients hostage since August of 2019 and has refused to relinquish control of the software developed by and for the Annihilyzer.

71.     What has now become clear is that Mr. Paris, with the assistance of Mr. Sipes and Annihilare, did anything but "faithfully serve" PCT during his employment.

72.     Mr. Paris, with the assistance of Mr. Sipes and Annihilare, used the broad access he was granted to the Confidential Information, including the AIP, the Material Tracking System, and the proprietary enhancements to the same, to abscond with certain of the Confidential Information, including the data, architecture and related information acquired and/or developed by PCT to support the protocol and reporting generator enhancements, and develop a competing dispensing system and software platform, with identical tracking protocols, for the sole benefit of himself and his company Annihilare.

73.     Upon information and belief, Defendants could not, and would not, have caused their competing dispensing system – the Accused Products – to be developed without access to, and the misappropriation of, certain of the Confidential Information, which access was granted to Messrs. Paris and Sipes only in their role as trusted PCT employees and subject to the aforementioned strict confidentiality restrictions.

74.     Upon information and belief, Mr. Paris, with the assistance of Mr. Sipes and Annihilare, used his position of trust and confidence, including the broad access he was granted to the Confidential Information, to abscond with certain of the Confidential Information, including some or all of the customer information, pricing and margin information, marketing and business plans, and customer lists described herein, for the purpose of targeting, soliciting and diverting customers and distributors of Plaintiffs.

75.     The disclosure of the Confidential Information to and subsequent use of that information by Annihilare to develop competing products has deprived Plaintiffs of the benefits and value of the information remaining secret by, among other ways, allowing Defendants to develop valuable products in direct competition with the Annihilyzer and thus reduce Plaintiffs' market share in the industry, solicit and divert valuable business opportunities away from

Plaintiffs, and damage Plaintiffs' reputation, both in the industry at large and with potential customers, distributors and investors.

76.    It has further become clear that throughout 2018 and 2019, when Mr. Paris was entrusted with helping develop the enhanced Material Tracking System for PCT, Mr. Paris was actually developing competing hypochlorous acid dispensing systems – the Accused Products – for Annihilare.

77.    Defendants have used the Confidential Information obtained from Messrs. Paris's and Sipes' work on the Material Tracking System to build AnniList by making only minor modifications to the software developed by and for Plaintiffs.

78.    While still employed by PCT in a management role with broad responsibilities over the Annihilyzer, Mr. Paris abandoned his work on developing enhancements to the protocols and software for Plaintiffs' Material Tracking System and devoted his time and energy to Annihilare generally and the development of the Accused Products.

79.    Mr. Paris, without authorization from Plaintiffs and in concert with Mr. Sipes and Annihilare, then installed the AnniList software on the Annihilyzer product when he was supposed to have been, and represented that he was, developing and installing PCT's enhanced Material Tracking System for and on the Annihilyzer product.

80.    The purpose of such conduct was to coerce Plaintiffs into purchasing or licensing the AnniList software from Annihilare to fully operate the Annihilyzer product.

81.    Such conduct has not only caused significant damage to Plaintiffs and one of their flagship products, but also to hospitals and other businesses throughout North Carolina and elsewhere which have been deprived of the valuable Annihilyzer product.

82.     As if such deceitful and unfair competitive conduct was not bad enough, Defendants have also misappropriated and used Plaintiffs' domain names –www.pcthealth.com, www.pcthealth.org and www.pcthealth.net – to benefit Annihilare.

83.     Specifically, Plaintiffs discovered on or about January 1, 2020 that the www.pcthealth.com domain had been hijacked by Mr. Paris and was under the exclusive control of, and being used by, Mr. Paris and his company Annihilare.

84.     Plaintiffs further discovered at that time that the www.pcthealth.com domain was automatically directing all internet traffic to Annihilare's website and its competing Accused Products.

85.     It is unknown how long the www.pcthealth.com domain was automatically directing internet traffic to Annihilare's website before Plaintiffs discovered it.

86.     Plaintiffs also discovered that the www.pcthealth.org domain was automatically directing internet traffic to Annihilare's website at least through the date that the initial complaint was filed in this case on May 15, 2020.  A true and accurate copy of a screenshot from May 14, 2020 showing internet traffic being automatically directed to the Annihilare website is annexed hereto as **Exhibit F**.

87.     It is not yet known how many prospective customers of Plaintiffs and the Annihilyzer were directed to and purchased a competing product from Annihilare as a result of Defendants' misappropriation, use, deceitful and unfair conduct concerning the www.pcthealth.com and www.pcthealth.org website domains.

88.     Annihilare apparently ceased automatically directing internet traffic to its website through the www.pcthealth.com and www.pcthealth.org domains (the latter only after it was

served with the original complaint in this action) and, for a certain time period through and including the filing of the original complaint on May 15, 2020 and for some period of time thereafter, instead posted a supposed "disclaimer" on the www.pcthealth.com website, which contains false and misleading statements concerning the Annihilyzer and constitutes an unauthorized use of PCT's ANNIHILYZER trademark.

89.     The www.pcthealth.net domain also included the same "disclaimer" containing false and misleading statements concerning, and unauthorized use of, PCT's ANNIHILYZER Mark.

90.     Plaintiffs first learned of Defendants' infringing use of the subject Mark in January of 2020 when they discovered that Defendants had posted the "disclaimer" on the www.pcthealth.com website and were using the ANNIHILYZER Mark on the website without Plaintiffs' authorization to advertise and sell its competing product, the AnniList. A true and accurate copy of Defendants' infringing use of the ANNIHILYZER Mark on www.pcthealth.com is annexed hereto as **Exhibit G**.

91.     Plaintiffs also learned of Defendants' infringing use of the ANNIHILYZER Mark through various social media posts on LinkedIn.

92.     Plaintiffs sent a cease and desist letter to Mr. Paris and Annihilare on March 31, 2020 demanding that Defendants immediately cease using all of PCT's intellectual property, including the AIP, enhancements to the AIP, and the ANNIHILYZER Mark, as well as the subject domain names, and return all of the AIP and domain names, but Defendants have refused to comply with the demands.

93.     Defendants continue to market and sell the competing Accused Products   which use and incorporate Plaintiffs' intellectual property and Confidential Information, including the AIP and enhancements to the same, and infringes upon PCT's patents, trademark and other intellectual property rights, to the detriment to both Plaintiffs and consumers at large.

94.     Defendants have used, and may continue to use, the www.pcthealth.com and www.pcthealth.org domains to deceive consumers and engage in unfair competitive conduct by automatically directing Plaintiffs' prospective customers to Annihilare when they are trying to find Plaintiffs and the Annihilyzer product.

95.     Defendants have used, and may continue to use, the domain names www.pcthealth.com and www.pcthealth.net to publish false and misleading statements about the Annihilyzer and otherwise use the ANNIHILYZER Mark for unfair competitive purposes.

## FIRST COUNT

### (Infringement of U.S. Patent No. 9,679,170 B2)

96.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

97.     Upon information and belief, Defendants have infringed, and are continuing to infringe, upon at least claims 1 and 21 of the '170 Patent in violation of 35 U.S.C. Section 271 (a), either literally or under the doctrine of equivalents, by manufacturing, using, offering to sell, selling, and/or importing infringing products.

98.     Claim 1 of the '170 Patent recites:

A monitoring system for a disinfectant, the system comprising:

first identifiers associated with containers for distributed dispensing of the disinfectant, each of the containers being reusable and having a volume of the

disinfectant, the volumes in the containers changing due to repeatable filling and dispensing of the disinfectant in the corresponding containers, the volume of the disinfectant in each container having a particular expiration;

second identifiers associated with locations for treatment with the disinfectant;

at least one reader reading the first and second identifiers;

at least one database associating, for each of the identified containers, the volume and the particular expiration of the disinfectant contained therein and associating the locations with the identified containers used in the treatment; and

processing equipment operatively coupled to the at least one reader and the at least one database, the processing equipment tracking the repeatable filling and dispensing of each of the volumes of the disinfectant, each of the particular expirations of the disinfectant associated with the tracked volumes, and each of the first identifiers of the identified containers having the tracked volumes, the processing equipment determining, based on the tracking, expiry of at least one of the tracked volumes of the disinfectant contained in at least one of the identified containers and tracking each of the treatments at the locations using the disinfectant from the tracked containers.

99.     Upon information and belief, Defendants have directly infringed, and are directly infringing, upon claim 1 of the '170 Patent by making, using, offering to sell, selling, and/or importing material tracking systems and device products in this District and elsewhere in the United States.

100.     Defendants provide a product manual and other information available on its website related to the Accused Products,[1] including PowerPoint slides for their AnniList Software Suite Platformat https://www.annihilare.com/hospital-disinfection-system/.     Upon information and belief, the Accused Products include and infringe upon each and every element of claim 1 of the '170 Patent.

---

[1] Plaintiffs served Defendants with their Initial Infringement Contentions on October 21, 2020, identifying how each claim element of the asserted patent claims are infringed by varying aspects of the Accused Products.  Plaintiffs' initial infringement contentions are annexed hereto as **Exhibit H** and incorporated herein by reference.

101.    Upon information and belief, the Accused Products include first identifiers associated with containers for distributed dispensing of the disinfectant, each of the containers being reusable and having a volume of the disinfectant, the volumes in the containers changing due to repeatable filling and dispensing of the disinfectant in the corresponding containers, and the volume of the disinfectant in each container having a particular expiration.  For example, it provides tracking of each piece of equipment used and its usage in the system through Asset Protocol Tracking using NFC chips located on each piece of equipment (first identifiers).  *See* the AnniList Software Overview PDF available at the Annihilare website at https://www.annihilare.com

102.    Upon information and belief, the Accused Products include second identifiers associated with locations for treatment with the disinfectant and at least one reader reading the first and second identifiers.  For example, the Accused Product provides Area Protocol tracking such that each area is outfitted with NFC identifiers that allow tracking of each location (second identifiers).  *See* Fig. 1 below:

## HOW IT WORKS - ANNILIST MOBILE

### AREA PROTOCOL TRACKING





- Each area is outfitted with an NFC chip decal and assigned a name. Decals can be AnniList branded or a custom design
- Users are assigned a unique 4-digit PIN
- Before service is performed, users will check-in
- and download the latest area information
- Users will then "tap" into the room and easily document the tasks performed
- AnniList captures the personnel name, time area was serviced and provides a custom protocol
  - Extra comments and other data can be submitted through the app as well (e.g. work orders, inventory levels, etc.)

Copyright 2020 Annihilare, Inc.

103.    Upon information and belief, the Accused Products include at least one database associating, for each of the identified containers, the volume and the particular expiration of the disinfectant contained therein and associating the locations with the identified containers used in the treatment.  For example, the Accused Products provide a database or dashboard where users and managers remotely push protocol updates in real-time, which is then communicated to its customer users.  *See* Fig. 2 below:

## HOW IT WORKS - DASHBOARD



Managers can log in through a SAAS (Software as a Service) dashboard at dashboard.annilist.com, from any laptop or desktop computer.



Inside the dashboard main page, managers can view/edit: Area Reports, Asset Reports, Mobile Devices, Protocols and Users. Managers will have the ability to remotely push protocol updates in real-time, which will display on the field users device.

Copyright 2020 Annihilare, Inc.

104.    Upon information and belief, the Accused Products include processing equipment operatively coupled to at least one reader and at least one database, the processing equipment tracking the repeatable filling and dispensing of each of the volumes of the disinfectant, each of the particular expirations of the disinfectant associated with the tracked volumes, and each of the first identifiers of the identified containers having the tracked volumes, the processing equipment determining, based on the tracking, expiry of at least one of the tracked volumes of the disinfectant contained in at least one of the identified containers and tracking each of the treatments at the locations using the disinfectant from the tracked containers. For example, the Accused Products generate reports of, among other things, asset and equipment usage as well as feedback to customers or management.

105.    Claim 21 of the '170 Patent recites:

A method of monitoring a disinfectant, the method comprising:

associating a plurality of first identifiers with a plurality of containers, each of the containers being reusable and storing a volume of the disinfectant for distributed dispensing, the volumes of the disinfectant in the containers changing due to repeatable filling and dispensing of the disinfectant in the corresponding containers, the volume of the disinfectant in each container having a particular expiration;

associating a plurality of second identifiers with a plurality of locations for treatment with the disinfectant;

obtaining, with the at least one reader of a monitoring system, one or more of the first identifiers associated with one or more of the containers for distributed dispensing of the disinfectant and one or more of the second identifiers associated with one or more of the locations;

storing, in at least one database, first information of the volume and the particular expiration of the disinfectant associated with each of the one or more identified containers and storing second information of the one or more identified locations associated with the identified containers used in the treatment;

tracking, with processing equipment of the monitoring system, each of the volumes of the disinfectant, each of the particular expirations of the disinfectant associated with the tracked volumes, each of the one or more identified containers using the first information;

tracking, with the processing equipment of the monitoring system, each of the treatments at the one or more identified locations using the disinfectant from the one or more identified containers using the second information.

106.   Upon information and belief, Defendants have directly infringed, and are continuing to directly infringe, upon claim 21 of the '170 Patent by making, using, offering to sell, selling, and/or importing material tracking systems and device products in this District and elsewhere in the United States.

107.   Upon information and belief, the Accused Products include and infringe upon each and every element of Claim 21 of the '170 Patent.

108.   Upon information and belief, the Accused Products include a method of monitoring a disinfectant.  For example, the Accused Products provide the Annihilare Healthcare

Infection Prevention System (HIPS™), a method of monitoring disinfectant use and administration. *See*, https://www.annihilare.com/hospital-disinfection-system/.

109. Upon information and belief, the Accused Products include associating a plurality of first identifiers with a plurality of containers, each of the containers being reusable and storing a volume of the disinfectant for distributed dispensing, the volumes of the disinfectant in the containers changing due to repeatable filling and dispensing of the disinfectant in the corresponding containers, and the volume of the disinfectant in each container having a particular expiration. For example, the Accused Products disclose "Asset Protocol Tracking" using NFC chips in each piece of equipment (first identifier). *See,* Fig. 3 below:



**HOW IT WORKS - ANNILIST MOBILE**

ASSET PROTOCOL TRACKING

 

- Each piece of equipment (asset) is outfitted with an NFC chip decal and assigned a name. Decals can be AnniList branded or a custom design
- Users will scan the NFC chip to document usage
- AnniList Mobile captures the personnel name, time the asset was used and provides a custom set of instructions for how to properly use and/ or maintain the asset
  - Data can be submitted through the app as well, to provide information back to management

Copyright 2020 Annihilare, Inc.

110. Upon information and belief, the Accused Products include associating a plurality of second identifiers with a plurality of locations for treatment with the disinfectant. For

example, the Accused Products provide "Area Protocol Tracking" in that each area includes NFC identifiers to track each location (second identifier). *See* Fig. 4 below:

## HOW IT WORKS - ANNILIST MOBILE

### AREA PROTOCOL TRACKING





- Each area is outfitted with an NFC chip decal and assigned a name. Decals can be AnniList branded or a custom design
- Users are assigned a unique 4-digit PIN
- Before service is performed, users will check-in and download the latest area information
- Users will then "tap" into the room and easily document the tasks performed
- AnniList captures the personnel name, time area was serviced and provides a custom protocol
  - Extra comments and other data can be submitted through the app as well (e.g. work orders, inventory levels, etc.)

Copyright 2020 Annihilare, Inc.

111.    Upon information and belief, obtaining, with the at least one reader of a monitoring system, one or more of the first identifiers associated with one or more of the containers for distributed dispensing of the disinfectant and one or more of the second identifiers associated with one or more of the locations.  For example, the "Asset Protocol Tracking" using NFC chips in "each piece of equipment." *See,* Fig. 5 below:

# HOW IT WORKS - ANNILIST MOBILE

### ASSET PROTOCOL TRACKING





- Each piece of equipment (asset) is outfitted with an NFC chip decal and assigned a name. Decals can be AnniList branded or a custom design
- Users will scan the NFC chip to document usage
- AnniList Mobile captures the personnel name, time the asset was used and provides a custom set of instructions for how to properly use and/ or maintain the asset
  - Data can be submitted through the app as well, to provide information back to management

Copyright 2020 Annihilare, Inc.

112.    Upon information and belief, the Accused Products include storing, in at least one database, first information of the volume and the particular expiration of the disinfectant associated with each of the one or more identified containers and storing second information of the one or more identified locations associated with the identified containers used in the treatment.  For example, the Accused Products provide a dashboard for managers to log in and view/edit reports.  *See,* Fig. 6 below:

## HOW IT WORKS - DASHBOARD



Managers can log in through a SAAS (Software as a Service) dashboard at dashboard.annilist.com, from any laptop or desktop computer.



Inside the dashboard main page, managers can view/edit: Area Reports, Asset Reports, Mobile Devices, Protocols and Users. Managers will have the ability to remotely push protocol updates in real-time, which will display on the field users device.

Copyright 2020 Annihilare, Inc.

113. Upon information and belief, the Accused Products include tracking, with processing equipment of the monitoring system, each of the volumes of the disinfectant, each of the particular expirations of the disinfectant associated with the tracked volumes, each of the one or more identified containers using the first information. For example, the Accused Products provide a platform for tracking use and providing feedback to customers and/or management. *See,* Fig. 7 below:

**AnniList Platform Modules**

**NFC TRACKING & PROTOCOLS**
- Build Custom Protocols for your staff to perform
- See what tasks were completed in which areas
- Monitor how long those tasks took to complete
- Generate Frequency Reports and other valuable data to manage tasks

**ASSET MANAGEMENT**
- Monitor the usage of equipment by personnel
- Receive notifications if equipment hasn't been used
- Document maintenance frequencies and generate reports
- Monitor inventory usage and distribution

**WORK ORDERS & INSPECTIONS**
- Build Custom Inspections and Rating Scores
- Generate Work Orders from those inspections or manually
- Set Due Dates and Task Details
- Take Before and After Photos of Work Order Tasks

**FEEDBACK MANAGEMENT**
- Allow Clients, Patients or Visitors to report issues via text message or QR code
- Quickly recieve notifications of issues in real-time
- Track issues and produce reports on all feedback
- Convert issues into Work Orders

114.     Upon information and belief, the Accused Products include tracking, with the processing equipment of the monitoring system, each of the treatments at the one or more identified locations using the disinfectant from the one or more identified containers using the second information.  For example, the Accused Products include tracking and provide "real time information on personnel activities and effectiveness with a built-in reporting system."  *See,* https://www.annihilare.com/annilist-2/.

115.     Upon information and belief, the Accused Products include determining, with the processing equipment based on the tracking, expiry of at least one of the tracked volumes of the disinfectant contained in at least one of the one or more identified containers.  For example, the Accused Products include tracking and provide feedback to alert customers and/or management of equipment and inventory of materials.  *See*, https://www.annihilare.comannilist-2/.

116.     PCT has suffered and continues to suffer damages including lost profits by reason of the direct infringement of Defendants and is entitled to recover the same or in any case not less than a reasonable royalty with respect thereto.

117. PCT has been and continues to be irreparably harmed by said infringement, in a manner not fully compensable by monetary damages, with the balance of hardships tipping strongly in PCT's favor, such that PCT is entitled to injunctive relief.

118. Defendants have willfully infringed, and continue to willfully infringe, the '170 Patent despite having direct knowledge of the '170 Patent and of the manner in which it infringes the same.

119. Defendants' willful and persistent infringement is exceptional entitling PCT to costs, expenses, disbursements, and reasonable attorneys' fees related to Defendants' patent infringement under 35 U.S.C. Section 285 and all other applicable statutes, rules and common law.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a) Granting an injunction against Defendants enjoining and prohibiting them from continuing to infringe upon the subject patent;

(b) Awarding compensatory damages, including lost profits or in any case not less than a reasonable royalty with respect thereto, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(c) Awarding treble, punitive and exemplary damages in an amount to be determined at trial;

(d) Awarding costs and attorneys' fees;

(e) Declaration of exception case; and

(f) Granting any and all other relief which this Court deems just and proper.

## SECOND COUNT

### (Infringement of U.S. Patent No. 10,521,765 B2)

120.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 119 above as though fully set forth herein.

121.    Upon information and belief, Defendants have infringed, and are continuing to infringe, upon claims 1 and 28 of the '765 Patent, including at least claims 1 and 28, in violation of 35 U.S.C. Section 271 (a), either literally or under the doctrine of equivalents, by manufacturing, using, offering to sell, selling, and/or importing the infringing Accused Products.

122.    Claim 1 of the '765 Patent recites:

A system for monitoring treatment of locations of a facility with a disinfectant, being expirable and being dispensed from a plurality of portable containers, each portable container having a volume that is fillable repeatedly with the disinfectant for dispensing in the treatment, the system comprising:

generation equipment configured to produce at least one type of the disinfectant;

a plurality of first identifiers being electronically readable and being associated with the plurality of portable containers each having the volume that is fillable repeatedly with the at least one type of the disinfectant for dispensing in the treatment;

communication equipment obtaining electronic input at least of each first identifier associated with the portable containers before dispensing in the treatment;

at least one database associating first information of each first identifier for each portable container with each volume and each expiration of the at least one type of the disinfectant filled in and dispensed from each portable container;

processing equipment operatively coupled to the at least one database and the communication equipment, the processing equipment tracking the first information using the electronic input and alerting an issue with the at least one type of the disinfectant in a given one of the portable containers before dispensing in the treatment based on the tracking; and

a filling station having the generation equipment incorporated therein with at least one or more of the communication equipment, the at least one database, and the

processing equipment, the filling station configured as a point of generation and distribution to fill the portable containers with the at least one type of the disinfectant.

123. Upon information and belief, Defendants have directly infringed, and are directly infringing, upon claims 1 and 28 of the '765 patent by making, using, offering to sell, selling, and/or importing a system for monitoring treatment of locations of a facility with disinfectant in this District and elsewhere in the United States.

124. Upon information and belief, the Accused Products include a systems that provide generation equipment configured to produce at least one type of disinfectant. For example, the Accused Products provide a system for generating a disinfectant such as hypochlorous acid. *See* https://www.annihilare.com/on-site-generation/.

125. Upon information and belief, the Accused Products include a plurality of first identifiers being electronically readable and being associated with the plurality of portable containers each having the volume that is fillable repeatedly with at least one type of the disinfectant for dispensing in the treatment. For example, the Accused Products provide for asset tracking of equipment usage and Asset Protocol Tracking using NFC/QR codes (first identifiers). *See* https://www.annihilare.com/hospital-disinfection-system/ and https://www.annihilare.com/annilist-2/.

126. Upon information and belief, the Accused Products include communication equipment obtaining electronic input at least of each first identifier associated with the portable containers before dispensing in the treatment. For example, the Accused Products Asset Protocol Tracking includes an NFC chip that communicates data through the AnniList App. *See,* Fig. 8 below.

## HOW IT WORKS - ANNILIST MOBILE

### ASSET PROTOCOL TRACKING





0001

- Each piece of equipment (asset) is outfitted with an NFC chip decal and assigned a name. Decals can be AnniList branded or a custom design
- Users will scan the NFC chip to document usage
- AnniList Mobile captures the personnel name, time the asset was used and provides a custom set of instructions for how to properly use and/ or maintain the asset
  - Data can be submitted through the app as well, to provide information back to management

Copyright 2020 Annihilare, Inc.

127.    Upon information and belief, the Accused Products include at least one database associating first information of each first identifier for each portable container with each volume and each expiration of at least one type of the disinfectant filled in and dispensed from each portable container.  For example, the Accused Products include transmitting or communicating data to a database with the AnniList App and an accompanying dashboard for viewing and editing reports.  *See,* Fig. 9 below:

## HOW IT WORKS - DASHBOARD



Managers can log in through a SAAS (Software as a Service) dashboard at dashboard.annilist.com, from any laptop or desktop computer.



Inside the dashboard main page, managers can view/edit: Area Reports, Asset Reports, Mobile Devices, Protocols and Users. Managers will have the ability to remotely push protocol updates in real-time, which will display on the field users device.

Copyright 2020 Annihilare, Inc.

128. Upon information and belief, the Accused Products include processing equipment operatively coupled to at least one database and the communication equipment, the processing equipment tracking the first information using the electronic input and alerting an issue with at least one type of the disinfectant in a given one of the portable containers before dispensing in the treatment based on the tracking. For example, the Accused Products include AnniList Platform Modules that provide tracking and feedback to alert customers and/or management of equipment usage in real time. *See* Fig. 7 above.

129. Upon information and belief, the Accused Products include a filling station having the generation equipment incorporated therein with at least one or more of the communication equipment, at least one database, and the processing equipment, the filling station configured as a point of generation and distribution to fill the portable containers with at least one type of the disinfectant. For example, the Accused Products include on-site production

and bottling of fluids, and information related to expiration dates. *See* https://www.annihilare.com/on-site-generation/.

130.    Claim 28 of the '765 Patent recites:

A method of monitoring treatment of locations of a facility with a disinfectant, the disinfectant being expirable and being dispensed from a plurality of portable containers, each portable container having a volume that is fillable repeatedly with the disinfectant for dispensing in the treatment, the method comprising:

producing, with generation equipment, at least one type of the disinfectant;

filling, from a filling station, the portable containers with the at least one type of the disinfectant, the filling station configured as a point of generation and distribution and having the generation equipment incorporated therein with at least one component of one or more of communication equipment, at least one database, and processing equipment;

associating together, in the at least one database, first information of the plurality of portable containers each having the volume for the disinfectant that is fillable repeatedly with the at least one type of the disinfectant for dispensing in the treatment, the first information comprising each first identifier for each portable container with each volume and each expiration of the at least one type of the disinfectant filled in and dispensed from each portable container;

obtaining, with the communication equipment, electronic input at least of each first identifier associated with the portable containers before dispensing in the treatment;

tracking, with the processing equipment, the first information using the electronic input; and

alerting, with the processing equipment, an issue with the disinfectant in a given one of the portable containers before dispensing in the treatment based on the tracking.

131.    Upon information and belief, the Accused Products include producing, with generation equipment, at least one type of the disinfectant.  For example, the Accused Products provide a method for generating a disinfectant such as hypochlorous acid.  *See* https://www.annihilare.com/on-site-generation/.

132. Upon information and belief, the Accused Products include filling, from a filling station, the portable containers with the at least one type of the disinfectant, the filling station configured as a point of generation and distribution and having the generation equipment incorporated therein with at least one component of one or more of communication equipment, at least one database, and processing equipment. For example, it provides a method for bottling fluids at a fill station that is fully automated with protocol tracking and bottling data. *See,* https://www.annihilare.com/on-site-generation.

133. Upon information and belief, the Accused Products include associating together, in the at least one database, first information of the plurality of portable containers each having the volume for the disinfectant that is fillable repeatedly with the at least one type of the disinfectant for dispensing in the treatment, the first information comprising each first identifier for each portable container with each volume and each expiration of the at least one type of the disinfectant filled in and dispensed from each portable container. For example, the Accused Products provide a method for providing data collected from the Asset Protocol Tracking feature to a database that monitors inventory usage and distribution and generates frequency reports. *See,* Fig. 9 below:

# HOW IT WORKS - ANNILIST MOBILE

**ASSET PROTOCOL TRACKING**





- Each piece of equipment (asset) is outfitted with an NFC chip decal and assigned a name. Decals can be AnniList branded or a custom design
- Users will scan the NFC chip to document usage
- AnniList Mobile captures the personnel name, time the asset was used and provides a custom set of instructions for how to properly use and/ or maintain the asset
  - Data can be submitted through the app as well, to provide information back to management

Copyright 2020 Annihilare, Inc.

134.     Upon information and belief, the Accused Products include obtaining, with the communication equipment, electronic input at least of each first identifier associated with the portable containers before dispensing in the treatment.  For example, the Accused Products disclose an Asset Protocol Tracking feature that uses NFC chips to obtain and communicate equipment usage before deploying additional disinfectant.  *See,* Fig. 9 above.

135.     Upon information and belief, the Accused Products include tracking, with the processing equipment, the first information using the electronic input.  For example, the Accused Products disclose tracking equipment usage using NFC/QR/Mobile technology "with an easy to operate platform, allowing you to track just about anything protocol and process-related." *See,* Slide 2 of PDF available at Annihilare website located at https://www.annihilare.com.

136.    Upon information and belief, the Accused Products include alerting, with the processing equipment, an issue with the disinfectant in a given one of the portable containers before dispensing in the treatment based on the tracking.  For example, the Accused Products provide a method for room tracking which allows real time information on personnel activities and effectiveness, with a built-in reporting system, including electrostatic applicators on handheld, backpack, and automated carts.  *See,* https://www.annihilare.com/annilist-2/.

137.    PCT has suffered and continues to suffer damages including lost profits by reason of the direct infringement of Defendants and is entitled to recover the same or in any case not less than a reasonable royalty and/or lost profits with respect thereto.

138.    PCT has been and continues to be irreparably harmed by said infringement, in a manner not fully compensable by monetary damages, with the balance of hardships tipping strongly in PCT's favor, such that PCT is entitled to injunctive relief.

139.    Defendants have willfully infringed, and continue to willfully infringe, the '765 Patent despite having direct knowledge of the '765 Patent and of the manner in which it infringes the same.

140.    PCT identifies several direct infringers of the '170 Patent, induced to infringe the same in the United States by Defendants.  For example, persons who practice the generation of disinfectant.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)    Granting an injunction against Defendants enjoining and prohibiting them from continuing to infringe upon the subject patent;

(b)     Awarding compensatory damages, including lost profits or in any case not less than a reasonable royalty with respect thereto, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(c)     Awarding treble, punitive and exemplary damages in an amount to be determined at trial;

(d)     Awarding costs and attorneys' fees;

(e)     Declaration of exceptional case; and

(f)     Granting any and all other relief which this Court deems just and proper.

## THIRD COUNT

### (Trademark Infringement under 15 U.S.C. § 1114)

141.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 140 above as though fully set forth herein.

142.    PCT owns the exclusive rights to U. S. Trademark Reg. No. 4521689, ANNIHILYZER, which is a valid and legally protectable trademark.

143.    Defendants' use of ANNIHILYZER, is likely to cause confusion, mistake, and deception as to the source of origin of the Defendants' goods and services and will injure and damage PCT and the goodwill and reputation symbolized by ANNIHILYZER.

144.    Likelihood of confusion is enhanced by the fact that the ANNIHILYZER is strong, well-known and entitled to a broad scope of protection.

145.    Likelihood of confusion is also enhanced by the fact that all of the parties to this action market and will likely market their goods and services in the same or similar channels of trade, now or by way of logical expansion.

146.    Defendants are not affiliated or connected to PCT and have not been endorsed or sponsored by PCT, nor has PCT approved any of Defendants' goods and services offered or sold or intended to be sold by Defendants under the ANNIHILYZER, nor have Defendants ever sought or obtained permission to use the Mark to divert sales of Defendants' goods by use of the goodwill and reputation built into ANNIHILYZER.

147.    PCT's United States Trademark Registration identified above provides, at the very least, constructive notice to Defendants of the rights of PCT in and to the Mark.

148.    Upon information and belief, Defendants have derived unlawful gains and profits from its infringing use of ANNIHILYZER.

149.    Upon information and belief, Defendants have intentionally adopted and use ANNIHILYZER so as to create consumer confusion and traffic off PCT's reputation and goodwill under the ANNIHILYZER Mark.

150.    PCT has no control over the quality of the goods and services offered by Defendants.  Thus, the value of the ANNIHILYZER Mark is subject to damage and dilution by an entity and individuals it cannot control, such as Defendants.

151.    Unless enjoined by this Court from so doing, Defendants will continue to engage in its acts of infringement, to the irreparable damage and injury of Plaintiffs.

152.    Upon information and belief, Defendants have engaged in acts of infringement, with knowledge of PCT's exclusive rights to ANNIHILYZER, and Defendants continue their intentional and willful infringement, thus entitling PCT to an award of treble damages, Defendants' profits, plus attorneys' fees and costs in bringing and maintaining this action pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1117(b).

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)     Granting an injunction against Defendants enjoining and prohibiting them from continuing to infringe upon the ANNIHILYZER Mark;

(b)     Awarding compensatory damages, including lost profits and/or disgorgement of Defendants' profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(c)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(d)     Awarding costs and attorneys' fees; and

(e)     Granting any and all other relief which this Court deems just and proper.

## <u>FOURTH COUNT</u>

**(Federal Unfair Competition, False Designation of Origin, and
False and Misleading Description and Representation under 15
U.S.C. § 1125(a))**

153.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 152 above as though fully set forth herein.

154.     The aforementioned acts of Defendants have caused and will continue to cause a likelihood of confusion in the minds of the trade and the public, and will damage PCT's reputation for exclusivity in connection with PCT's ANNIHILYZER Mark and registration, as well as for quality and reliable goods and services of PCT.

155.     Defendants' acts constitute the use of a false designation of origin, a false representation, and unfair competition, by inducing the erroneous belief that Defendants are in some manner affiliated with, originate from, or are sponsored by Plaintiffs, all in violation of 15 U.S.C. § 1125(a) of the Lanham Act.

156.     Defendants' acts are willful, unfair, untrue, and deceptive, in that they tend to mislead, deceive and confuse, and will have the result of misleading, deceiving and confusing the public to believe that Defendants are affiliated with, sponsored or controlled by Plaintiffs. As a result, Defendants have traded upon, and gained public acceptance and other benefits from Plaintiffs' favorable reputation, which has accordingly been diminished by Defendants' past and continued illegal and improper acts.

157.     Upon information and belief, Defendants' unlawful actions have interfered with Plaintiffs' sales, have unfairly diverted sales to Defendants, and have caused Plaintiffs monetary damage.

158.     Defendants have and continue to cause irreparable harm and damage to Plaintiffs, and have caused Plaintiffs to suffer monetary damages in an amount thus far not determined. Plaintiffs have demanded Defendants cease and desist, but Defendants refuse.

159.     Plaintiffs have no adequate remedy at law for the injury alleged in this Count, and said injury is, in part, intangible in nature and not capable of being fully measured or valued entirely in terms of monetary damages.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)     Granting an injunction against Defendants enjoining and prohibiting them from continuing to infringe upon the ANNIHILYZER Mark;

(b)      Awarding compensatory damages, including lost profits and/or disgorgement of Defendants' profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(c)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(d)     Awarding costs and attorneys' fees; and

44

(e)     Granting any and all other relief which this Court deems just and proper.

## FIFTH COUNT

### (Trademark Dilution under 15 U.S.C. § 1125(c))

160.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 159 above as though fully set forth herein.

161.    As a result of PCT's exclusive and widespread use and promotion of its services and goods, its extensive sales and its brand and corresponding intellectual property have become famous and distinctive, and indicate a single source of origin.

162.    After the ANNIHILYZER became famous and distinctive, Defendants began commercial use of PCT's Mark, which caused dilution of the distinctive quality of the Mark and registration, in violation of 15 U.S.C. § 1125(c) of the Lanham Act.

163.    Upon information and belief, Defendants' unlawful actions have interfered with Plaintiffs' sales, have unfairly diverted sales to Defendant, and have caused Plaintiffs monetary damage.

164.    Defendants have and continue to cause irreparable harm and damage to Plaintiffs, and has caused Plaintiffs to suffer monetary damages in an amount thus far not determined. Plaintiffs have demanded Defendants cease and desist, but Defendants refuse.

165.    Plaintiffs have no adequate remedy at law for the injury alleged in this Count, and said injury is, in part, intangible in nature and not capable of being fully measured or valued entirely in terms of monetary damages.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)     Granting an injunction against Defendants enjoining and prohibiting them from continuing to infringe upon the ANNIHILYZER Mark;

(b)      Awarding compensatory damages, including lost profits and/or disgorgement of Defendants' profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(c)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(d)     Awarding costs and attorneys' fees; and

(e)     Granting any and all other relief which this Court deems just and proper.

## SIXTH COUNT

### (Federal Cybersquatting Under 15 U.S.C. § 1125(d))

166.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 165 above as though fully set forth herein.

167.     With respect to Defendants' unlawful and bad faith registration of the domains pcthealth.com, pcthealth.net and pcthealth.org, Defendants' acts constitute use of domains that are virtually identical to, confusingly similar to, and dilutive of Plaintiffs' common law trademark protection in "PCT" and "PCT HEALTH", made knowingly and with a bad-faith intent to profit therefrom.

168.     Defendants' bad faith registration of the domains, with intentional diversion of Plaintiffs' customers to its own website, that provides competing goods and services, is with the intent to profit from Plaintiffs' common law Marks by using a domain name that is identical or confusingly similar to Plaintiff's' common law Marks and, to the extent the Marks are famous, is identical to, confusingly similar to, or dilutive of the Marks, thereby constituting unlawful

cybersquatting in violation of the Anticybersquatting Consumer Protection act, 15 U.S.C. § 1125(d).

169. Defendants' willful and bad-faith registration and continued use of the domain name has caused and continues to cause significant and irreparable harm, including harm to the value and goodwill associated with Plaintiffs' common law Marks, that money alone cannot compensate. Therefore, Plaintiffs are entitled to injunctive relief, including but not limited to Defendants being permanently enjoined from continued use of the domains and an order directing Defendants to transfer the registration of the subject domains to Plaintiffs.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a) Granting an injunction against Defendants enjoining and prohibiting them from continuing to use the subject domain name;

(b) Ordering Defendants to transfer the subject domain names to Plaintiffs;

(c) Awarding compensatory damages, including lost profits and/or disgorgement of Defendants' profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(d) Awarding punitive and exemplary damages in an amount to be determined at trial;

(e) Awarding costs and attorneys' fees; and

(f) Granting any and all other relief which this Court deems just and proper.

## <u>SEVENTH COUNT</u>

### (Violations of Defend Trade Secrets Act)

170. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 169 above as though fully set forth herein.

171.    The Confidential Information, including the AIP, the proprietary enhancements to the AIP, and the other commercially sensitive information described herein, constitutes protected trade secrets under the Defend Trade Secrets Act.

172.    Plaintiffs have taken reasonable and necessary steps to protect the secrecy of the Confidential Information and protect it from disclosure to third parties.

173.    The Confidential Information is not generally known or capable of being readily ascertainable through proper means, has independent economic value, both to Plaintiffs and in the marketplace, by virtue of being secret, and, if disclosed and/or used by competing enterprises, would provide enormous value to any such competitor (as it has to Defendants) while at the same time causing irreparable harm to Plaintiffs.

174.    Defendants knowingly, wrongfully, maliciously, and with intent converted and retained the Confidential Information by improper and unlawful means, including, without limitation, by misappropriating certain of the Confidential Information, including the AIP and proprietary enhancements to the same, during Messrs. Paris and Sipes' employment with Plaintiffs and using such information to build, market and sell competitive products with nearly identical (and stolen) features and capabilities.

175.    The Confidential Information relates to, among other things, the AIP PCT purchased from Mr. Paris's company, Annihilyzer, Inc., in 2016, the proprietary enhancements to the AIP, including the enhanced tracking protocols to the Material Tracking System and software for the same, and all data, architecture and other information relating to the development of the protocol and software enhancements, other project information, and customer information, including lists, as described herein (*see, supra*, at ¶ 42).

176.    Messrs. Paris and Sipes misappropriated the Confidential Information to benefit their company Annihilare, with the knowledge and expectation that the misappropriation and use of such information would cause significant harm to Plaintiffs.

177.    Defendants have used and disclosed, and are still using and disclosing, the Confidential Information to develop a competitive product with nearly identical features and capabilities and market and sell their stolen product to consumers located in the State of North Carolina and throughout the United States.

178.    As a result of Defendants' misappropriation of the Confidential Information, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to, among other things, preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)    Entering an order seizing the Confidential Information from Defendants;

(b)    Granting an injunction against Defendants enjoining and prohibiting them from using and/or disclosing the Confidential Information;

(c)    Granting an injunction against Defendants enjoining and prohibiting them from using the Confidential Information to compete or solicit, or attempt to solicit, directly or indirectly, any current or prospective customers of Plaintiffs;

(d)    Directing the immediate return of all the Confidential Information in Defendants' possession, custody, or control;

(e)    Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs, pursuant to 18 U.S.C. § 1836(b)(3)(B)(i);

(f)     Requiring disgorgement of any and all monetary benefit Defendants received as a result of their misappropriation of the Confidential Information pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii);

(g)     Awarding punitive and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) in an amount to be determined at trial;

(h)     Awarding costs and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D); and

(i)     Granting any and all other relief which this Court deems just and proper.

## EIGHTH COUNT

### (Violations of North Carolina Trade Secrets Protection Act)

179.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 178 above as though fully set forth herein.

180.    The above-described Confidential Information constitutes protected trade secrets under the North Carolina Trade Secrets Protection Act.

181.    Plaintiffs have taken reasonable and necessary steps to protect the secrecy of the Confidential Information and protect it from disclosure to third parties.

182.    The Confidential Information is not generally known or capable of being readily ascertainable through proper means, has independent economic value, both to Plaintiffs and in the marketplace, by virtue of being secret, and, if disclosed and/or used by competing enterprises, would provide enormous value to any such competitor (as it has to Defendants) while at the same time causing irreparable harm to Plaintiffs.

183.    Defendants knowingly, wrongfully, maliciously, and with intent converted and retained the Confidential Information by improper and unlawful means, including, without limitation, by misappropriating certain of the Confidential Information, including the AIP and

proprietary enhancements to the same, during Messrs. Paris and Sipes' employment with Plaintiffs and using such information to build, market and sell competitive products with nearly identical (and stolen) features and capabilities.

184.    The Confidential Information relates to, among other things, the AIP Plaintiffs' purchased from Mr. Paris's company, Annihilyzer, Inc., in 2016, the proprietary enhancements to the AIP, including the enhanced tracking protocols to the Material Tracking System and software for the same, and all data, architecture and other information relating to the development of the protocol and software enhancements, other project information, and customer information, including lists, as described herein (*see, supra*, at ¶ 42).

185.    Messrs. Paris and Sipes misappropriated the Confidential Information to benefit their company Annihilare, with the knowledge and expectation that the misappropriation and use of such information would cause significant harm to Plaintiffs.

186.    Defendants have used and disclosed, and are still using and disclosing, the Confidential Information to develop a competitive product with nearly identical features and capabilities and market and sell their stolen product to consumers located in the State of North Carolina and throughout the United States.

187.    As a result of Defendants' misappropriation of the Confidential Information, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to, among other things, preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)    Granting an injunction against Defendants enjoining and prohibiting them from using and/or disclosing the Confidential Information;

(b)     Granting an injunction against Defendants enjoining and prohibiting them from using the Confidential Information to compete or solicit, or attempt to solicit, directly or indirectly, any customers of Plaintiff;

(c)     Directing the immediate return of all the Confidential Information in their possession, custody, or control;

(d)     Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs;

(e)     Requiring disgorgement of any and all monetary benefit Defendants received as a result of their misappropriation of the Confidential Information;

(f)     Awarding punitive and exemplary damages in an amount to be determined at trial pursuant to N.C. Gen. State. § 66-154(c);

(g)     Awarding costs and attorneys' fees pursuant to N.C. Gen. State. § 66-154(d); and

(h)     Granting any and all other relief which this Court deems just and proper.

## NINTH COUNT

### (Violations of N.C. Gen. Stat. Section 75-1.1 and Common Law Unfair Competition)

188.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 187 above as though fully set forth herein.

189.    Plaintiffs have invested significant time, labor, skill, money, and other resources into developing, maintaining, and protecting the Confidential Information, including the AIP and the enhancements to the AIP and Material Tracking System.

190.    Plaintiffs have similarly invested significant time, labor, skill, money, and other resources into purchasing, developing and maintaining certain websites and domain names for, among other purposes, the marketing and sale of the Annihilyzer.

191.    The above-described investments are in addition to the significant monetary and other investments made by the Plaintiffs in acquiring the AIP, including the Annihilyzer trademark, the Material Tracking System, know how, and goodwill, marketing the Annihilyzer, enhancing the capabilities of the Annihilyzer, and cultivating valuable goodwill for the Annihilyzer throughout the healthcare and other industries.

192.    Defendants have engaged in numerous unfair methods of competition and deceptive activities to develop and market for sale competing hypochlorous acid dispensing systems (the Accused Products) with nearly identical capabilities and features to the Annihilyzer.

193.    Such unfair and deceptive practices include, without limitation, misappropriating and using certain of Plaintiff's Confidential Information, including the AIP and certain protocol and software enhancements to the same, to develop a set of tracking protocols identical to the Annihilyzer, taking exclusive control over the software enhancements for the Annihilyzer and cutting PCT and its customers off from access to that software despite the fact that it was developed by and for PCT, misappropriating certain internet domain names acquired by and developed for Plaintiffs and using the same to direct internet traffic to Annihilare and its competing Accused Products, and willfully infringing upon PCT's patents and the ANNIHILYZER trademark.

194.    Defendants' unfair competition and deceptive conduct has and will affect commerce, as Defendants have used such wrongful conduct to, *inter alia*:

          a.    develop nearly identical hypochlorous acid dispensing systems for sale in the State of North Carolina and elsewhere;

          b.    deprive Plaintiffs of the ability to sell, and consumers the ability to access and purchase, an extremely important product, which significantly reduces the risk of infection

and spread of contagions, by misappropriating the AIP and valuable proprietary enhancements to the Annihilyzer generally and the Material Tracking System specifically for their exclusive use and subsequently cutting Plaintiffs and their customers off from the software needed to run the Annihilyzer system; and

c.     use the domain names Defendants misappropriated from Plaintiffs to direct all internet traffic attempting to access Plaintiffs' websites to Annihilare's website and its nearly identical competing product developed through wrongful means.

195.     As a result of Defendants' unfair competition and deceptive trade practices against Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial and is entitled to preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)     Granting an injunction against Defendants enjoining and prohibiting them from using and/or disclosing the Confidential Information, including the AIP and enhancements thereto;

(b)     Granting an injunction against Defendants enjoining and prohibiting them from using the subject web domains;

(c)     Granting an injunction against Defendants enjoining and prohibiting them from using the Confidential Information, including the AIP and enhancements thereto, to compete or solicit, or attempt to solicit, directly or indirectly, any customers of Plaintiffs;

(d)     Directing the immediate return of all the Confidential Information, including the AIP and enhancements thereto, and subject web domains in their possession, custody, or control;

(e)     Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs, and trebled pursuant to N.C. Gen. Stat. Section 75-16;

(f)     Awarding costs and attorneys' fees pursuant to N.C. Gen. Stat. Section 75-16.1; and

(g)     Granting any and all other relief which this Court deems just and proper.

## TENTH COUNT

### (Breach of Fiduciary Duty)

196.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 195 above as though fully set forth herein.

197.    Mr. Paris was hired as a key employee of PCT during a critical time in PCT's development of a crucial and valuable product it was working to bring to market.

198.    In entering into the Employment Agreement, PCT relied upon representations and assurances that Mr. Paris made that he would use his unique skills and abilities to help PCT finish development of the Annihilyzer and bring it to market.

199.    PCT employed Mr. Paris in a highly confidential capacity and, as a result of his position, he was provided access to and/or developed certain Confidential Information and valuable customer relationships on behalf and for the benefit of PCT.

200.    In hiring Mr. Paris, PCT entrusted Mr. Paris with access to and knowledge of confidential and proprietary work product created by other of Plaintiffs' employees.  Mr. Paris would not have been able to bring a product such as the Annihilyzer to market without the skills and expertise that certain of these other key employees possessed.

201.	As a result of the nature of Mr. Paris's skills, the work he was to perform for PCT, and the access he was provided to PCT's Confidential Information, customer relationships, and goodwill, it was understood by both PCT and Mr. Paris that Mr. Paris would at all times be acting in PCT's best interests, and not in his own.

202.	In light of the above, Mr. Paris was a key and special employee of PCT, and Mr. Paris accepted a special trust in connection with his employment with PCT.  There was therefore created a fiduciary relationship between Mr. Paris and Plaintiff.

203.	Mr. Paris thus owed PCT the duties of loyalty, fair dealing, utmost good faith and full disclosure which, among other things, required him to act in good faith and with due regard for PCT's interests.

204.	Notwithstanding his fiduciary obligations to PCT, Mr. Paris repeatedly and blatantly breached his fiduciary duties to PCT by, *inter alia*, doing the following:

a.	misappropriating for his benefit and the benefit of Annihilare certain of the AIP and proprietary enhancements to the same, including the software developed by and for PCT and the data and architecture relating to the same, to develop the competing Accused Products with identical features and capabilities, all while employed by PCT in a management role;

b.	abandoning his work on the enhancements to the protocols and software for the Material Tracking System for the Annihilyzer;

c.	using the information and work product he and the rest of Plaintiffs' team developed for PCT's Material Tracking System in Annihilare's competing AnniList product and incorporating the same into the Annihilyzer without authorization;

d.     effectively holding Plaintiffs' and their customers who purchased the Annihilyzer hostage by attempting to force them to license AnniList from Annihilare even though the AnniList was developed through the use of Plaintiffs' Confidential Information, including the AIP and proprietary enhancements to the same, and other significant and valuable investments of time, labor, money, and other resources; and

e.     stealing and using certain domain names acquired by Plaintiffs (www.pcthealth.com, www.pcthealth.org, and www.pcthealth.net) to direct all internet traffic (*i.e.*, potential customers seeking out Plaintiffs and their Annihilyzer product) to Annihilare and its competing products.

205.   As a result of Mr. Paris's breaches of his fiduciary duties, PCT has been damaged in an amount to be proven at trial and are entitled to preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)    Granting an injunction against Mr. Paris enjoining and prohibiting him from using and/or disclosing the Confidential Information;

(b)    Granting an injunction against Mr. Paris enjoining and prohibiting him from using the subject web domains;

(c)    Granting an injunction against Mr. Paris enjoining and prohibiting him from using the Confidential Information to compete or solicit or attempt to solicit, directly or indirectly, any customers of Plaintiffs;

(d)    Directing the immediate return of all the Confidential Information and subject web domains in his possession, custody, or control;

(e)    Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs;

(f)     Requiring disgorgement of any and all monetary benefit Mr. Paris received as a result of Mr. Paris's breaches of fiduciary duty;

(g)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(h)     Awarding costs and attorneys' fees; and

(i)     Granting any and all other relief which this Court deems just and proper.

## ELEVENTH COUNT

### (Breach of the Duty of Loyalty and Faithless Service)

206.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 205 above as though fully set forth herein.

207.    As explained herein, Mr. Paris owed PCT certain fiduciary duties during the term of his employment with PCT, which include, among others, the duties of good faith, fair dealing, candor and loyalty.  Mr. Paris was therefore obligated to at all times "faithfully serve" and act in the best interest of PCT.

208.    Notwithstanding these obligations, Mr. Paris breached his fiduciary obligations to PCT by, among other things:

a.     misappropriating for his benefit and the benefit of Annihilare certain of the AIP and proprietary enhancements to the same, including the software developed by and for PCT and the data and architecture relating to the same, to develop competing Accused Products with identical features and capabilities, all while employed by PCT in a management role;

b.     abandoning his work on the enhancements to the protocols and software for PCT's Material Tracking System for the Annihilyzer;

c. using the information and work product he and the rest of Plaintiffs' team developed for the Material Tracking System in Annihilare's competing AnniList product and incorporating the same into the Annihilyzer without authorization;

d. effectively holding Plaintiffs and their customers who purchased the Annihilyzer hostage by attempting to force them to license AnniList from Annihilare even though the AnniList was developed through the use of Plaintiffs' Confidential Information, including the AIP and proprietary enhancements to the same, and other significant and valuable investments of time, labor, money, and other resources; and

e. stealing and using certain domain names acquired by Plaintiffs (www.pcthealth.com, www.pcthealth.org, and www.pcthealth.net) to direct all internet traffic (*i.e*., potential customers seeking out Plaintiffs and their Annihilyzer product) to Annihilare and its competing products.

209. Upon information and belief, Mr. Paris made plans to engage, and subsequently engaged, in the above-described breaches of fiduciary duty throughout the term of his employment with PCT from September 1, 2017 through July 31, 2019.

210. As a result of Mr. Paris's breaches of his fiduciary duties, PCT has been damaged in an amount to be proven at trial and are entitled to, among other things, disgorgement of all compensation paid to Mr. Paris throughout the period of his infidelity and both preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a) Granting an injunction against Mr. Paris enjoining and prohibiting him from using and/or disclosing the Confidential Information;

(b)     Granting an injunction against Mr. Paris enjoining and prohibiting him from using the subject internet domains;

(c)     Granting an injunction against Mr. Paris enjoining and prohibiting him from using the Confidential Information to compete or solicit or attempt to solicit, directly or indirectly, any current or prospective customers of Plaintiffs;

(d)     Directing the immediate return of all the Confidential Information and subject internet domains in his possession, custody, or control;

(e)     Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs;

(f)     Requiring disgorgement of all compensation of any type paid by Plaintiffs to Mr. Paris during his period of infidelity;

(g)     Requiring disgorgement of any and all monetary benefit Mr. Paris has received as a result of his breaches of fiduciary duty;

(h)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(i)     Awarding costs and attorneys' fees; and

(j)     Granting any and all other relief which this Court deems just and proper.

<u>**TWELFTH COUNT**</u>

**(Breach of the Consulting Agreements)**

211.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 210 above as though fully set forth herein.

212.    As stated above, Mr. Paris entered into substantially identical Consulting Agreements with PCT Corp. for good and valuable consideration, on or about February 1, 2016 and on July 1, 2016, respectively.

213. PCT Corp. fully performed its obligations under the Consulting Agreements, to include paying to Mr. Paris the compensation to be paid thereunder.

214. Under those Consulting Agreements, Mr. Paris agreed, among other things, that all intellectual property, documents and information made or conceived by PCT Corp.'s employees in the course of their work with Mr. Paris would be and remain the exclusive property of PCT Corp.

215. By reason of the misconduct described above, Mr. Paris has breached his duty to afford to PCT Corp. the possession and ownership of the intellectual property, documents and information that were made or conceived by its employees in connection with the work that Mr. Paris performed under the Consulting Agreements.

216. By reason of Mr. Paris's breaches of the Consulting Agreements, PCT Corp. has been damaged in an amount to be determined but exceeding the jurisdictional thresholds of this Court.

**WHEREFORE**, Plaintiff prays that the following judgment be entered:

(a) Awarding damages, including restitution and lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(b) Awarding costs and attorneys' fees; and

(c) Granting any and all other relief which this Court deems just and proper.

## THIRTEENTH COUNT

### (Breach of the Employment Agreement)

217. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 216 above as though fully set forth herein.

218.     As stated above, Mr. Paris entered into an Employment Agreement with PCT, for good and valuable consideration, on or about September 1, 2017.

219.     PCT fully performed its obligations under the Employment Agreement, including payment of the compensation and benefits provided thereunder.

220.     Mr. Paris agreed, as an express condition of his employment with PCT, that, "either during the term of his employment with the Company or any time thereafter," he would not, among other things, "disclose or cause to be disclosed, to any person or entity whatsoever (with the exception of the Company and its employees, officers, directors and agents), and unless required by law, any secrets or confidential information concerning the technical trade secrets, business, affairs or financial performance or position of the Company."

221.     Mr. Paris is wrongfully in possession of certain Confidential Information.

222.     Upon information and belief, Mr. Paris has disclosed certain of the Confidential Information to third parties in violation of the Employment Agreement.

223.     Mr. Paris also agreed, as an express condition of his employment with Plaintiff, that he would "faithfully serve" PCT and "devote the whole of his time and attention during business hours to the business of [Plaintiff]." While Mr. Paris and PCT agreed, despite his duty of loyalty to PCT, that he would be permitted to "remain CEO/President of "Annihilare, Inc.", that understanding was conditioned on the related understanding that his position with Annihilare, Inc. would "not interfere with or obstruct [his] ability to perform his duties and responsibilities to [PCT] in any material way."

224.     By reason of the misconduct described above, Mr. Paris breached his contractual obligation to provide PCT with his exclusive service inasmuch as his efforts with and on behalf of Annihilare, Inc. and the other Defendants herein, which occurred while he was still in PCT's

employ, involved him competing with and undermining PCT and thus "obstruct[ed his] ability to perform his duties and responsibilities to [PCT]."

225.    By reason of Mr. Paris's breaches of the Employment Agreement, PCT has been damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiff prays that the following judgment be entered

(a)    Awarding damages, including restitution and lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs;

(b)    Awarding costs and attorneys' fees; and

(c)    Granting any and all other relief which this Court deems just and proper.

## FOURTEENTH COUNT

### (Tortious Interference with Prospective Business Relationships Against All Defendants)

226.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 225 above as though fully set forth herein.

227.    Defendants induced potential customers of Plaintiffs to refrain from entering into contracts with Plaintiffs.

228.    Defendants thusly induced potential customers of Plaintiffs by means that were improper and unlawful. Specifically, Mr. Paris procured website domains on behalf of Plaintiffs while employed by Plaintiffs in a key and confidential position, but thereafter failed and refused to tender possession and control of the websites to Plaintiffs despite Plaintiffs' demand therefor. Defendants then used Plaintiffs' trade name to maintain and promote the website and thereby diverted potential customers to Defendants' competing business. Furthermore, Defendants improperly used the website to divert customers to a competing business that was established and

operated on the strength of Confidential Information that Defendants had misappropriated from Plaintiffs.

229.     Upon information and belief, absent Defendants' aforesaid interference, Plaintiffs would have been able to enter into multiple contracts for business with prospective customers that are now lost to Plaintiffs.

230.     Given the type of interference by Defendants, *i.e.*, the use of the Confidential Information and the website domains to direct would-be customers of Plaintiffs to Defendants, Defendants are in the exclusive possession of all information identifying which prospective customers they obtained through improper and unlawful means at the expense of, and significant and ongoing harm to, Plaintiffs.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)      Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs;

(b)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(c)     Awarding costs and attorneys' fees; and

(d)     Granting any and all other relief which this Court deems just and proper.

## FIFTEENTH COUNT

### (Unjust Enrichment Against All Defendants)

231.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 230 above as though fully set forth herein.

232.     By virtue of Defendants' misappropriation of the Confidential Information and web domains, and their use and/or disclosure of the same, in order to unfairly compete against Plaintiffs, as well as to solicit and divert current and potential customers and business from

Plaintiffs for their own benefit, Plaintiffs have been deceived and coerced into unwillingly conferring a benefit on Defendants.

233.     The benefits conferred upon the Defendants can, in part, be measured by the monetary benefit realized by the Defendants as a result of their misconduct.

234.     Defendants have knowingly benefited from the above-described misconduct and have therefore been unjustly enriched at the expense of Plaintiffs.

235.     Plaintiffs are thus entitled to an award of damages in an amount equal to any monetary benefit that Defendants have received as a result of their misconduct.

**WHEREFORE**, Plaintiff prays that the following judgment be entered:

(a)     Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interests and costs;

(b)     Awarding costs and attorneys' fees; and

(c)     Granting any and all other relief which this Court deems just and proper.

## SIXTEENTH COUNT

### (Conversion Against All Defendants)

236.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 235 above as though fully set forth herein.

237.     Plaintiffs are and have at all relevant times been the rightful owners and lawful possessors of the Confidential Information and certain domain names, www.pcthealth.com, www.pcthealth.net and www.pcthealth.org.

238.     Defendants have taken and exercised unauthorized possession and control over the Confidential Information and subject domain names insomuch as they have improperly acquired and retained the Confidential Information and web domains.

239. As a result of Defendants' misconduct, Plaintiffs have been deprived of possession or control of the Confidential Information and subject domain names.

240. Such actions by Defendants constitute a conversion of the Confidential Information and web domains.

241. As a result of such conversions, Plaintiffs have been damaged in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a) Awarding compensatory damages in an amount to be determined at trial but no less than $75,000 exclusive of interest and costs;

(b) Awarding punitive and exemplary damages in an amount to be determined at trial;

(c) Awarding costs and attorneys' fees; and

(d) Granting any and all other relief which this Court deems just and proper.

## SEVENTEENTH COUNT

### (Civil Conspiracy Against All Defendants)

242. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 241 above as though fully set forth herein.

243. Defendants agreed to act in concert to injure Plaintiffs, to wit, by misappropriating the Confidential Information and using and disclosing the same to unfairly compete against Plaintiff, develop competing (and infringing) products, and solicit and divert current and potential customers and other business from Plaintiffs.

244. Defendants further agreed to act in concert to injure Plaintiffs, to wit, by wrongfully acquiring and using certain website domains, which properly belong to Plaintiffs, and

using the website domains to unfairly compete against Plaintiffs and solicit and divert current and potential customers and other business from Plaintiffs.

245.    Defendants, in furtherance of the conspiracy, misappropriated the Confidential Information and web domains and are using and disclosing the same to unfairly compete against Plaintiffs, solicit and divert current and potential customers, and other business from Plaintiffs for the benefit of Defendants.

246.    Defendants acted willfully, maliciously, and with the intent to cause harm to Plaintiffs in committing the above wrongful acts in furtherance of the conspiracy.

247.    As a result of this conspiracy, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a)    Granting an injunction against Defendants enjoining and prohibiting them from using and/or disclosing the Confidential Information;

(b)    Granting an injunction against Defendants enjoining and prohibiting them from using the subject web domains;

(c)    Granting an injunction against Defendants enjoining and prohibiting them from using the Confidential Information to compete or solicit, or attempt to solicit, directly or indirectly, any customers of Plaintiffs;

(d)    Directing the immediate return of all the Confidential Information and subject web domains in their possession, custody, or control;

(e)    Awarding compensatory damages, including lost profits, in an amount to be determined at trial, but no less than $75,000 exclusive of interest and costs;

(f)     Requiring disgorgement of any and all monetary benefit Defendants received as a result of their conspiracy to misappropriate the Confidential Information and unfairly compete against Plaintiffs;

(g)     Awarding punitive and exemplary damages in an amount to be determined at trial;

(h)     Awarding costs and attorneys' fees; and

(i)     Granting any and all other relief which this Court deems just and proper.

## EIGHTEENTH COUNT

### (Injunctive Relief Against All Defendants)

248.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 247 above as though fully set forth herein.

249.     Defendants have infringed – and are still infringing – upon certain patents and the ANNIHILYZER Mark owned by PCT, as detailed herein.

250.     Defendants misappropriated the above-described Confidential Information and web domains, and are using and/or disclosing the same, to unfairly compete against Plaintiffs, develop, market and sell competing (and infringing) products, the Accused Products, and solicit and divert current and potential customers from Plaintiffs.

251.     As a result of Defendants' misconduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm.

252.     The damages caused by the Defendants' misconduct are difficult to ascertain, are irreparable, and are likely to continue.

253.     Monetary damages alone cannot adequately compensate Plaintiffs for their potential loss of valuable current, prospective and repeat customers, and damage to their

reputation and the goodwill they developed over many years through significant investment. As such, Plaintiffs have no adequate remedy at law.

254. Granting Plaintiffs injunctive relief is not adverse to the public interest. In fact, an injunction against Defendants' wrongful conduct will serve the public interest by protecting intellectual property, trade secrets and preventing unfair competition.

255. The harm faced by Plaintiffs outweighs any harm that Defendants may suffer from an order granting Plaintiffs injunctive relief.

256. By reason of the foregoing, Plaintiffs are entitled to a permanent injunction enjoining and restraining Defendants from continuing to infringe on PCT's patents and trademark, using and disclosing Plaintiffs' Confidential Information, and using and disclosing Plaintiffs' web domains and otherwise unlawfully competing against Plaintiffs.

**WHEREFORE**, Plaintiffs pray that the following judgment be entered:

(a) Granting an injunction against Defendants enjoining and prohibiting them continue to infringe upon PCT's patents and the ANNIHILYZER Mark;

(b) Granting an injunction against Defendants enjoining and prohibiting them from using and/or disclosing the Confidential Information;

(c) Granting an injunction against Defendants enjoining and prohibiting them from using the subject web domains;

(d) Granting an injunction against Defendants enjoining and prohibiting them from using the Confidential Information to compete or solicit, or attempt to solicit, directly or indirectly, any customers of Plaintiffs;

(e) Awarding costs and attorneys' fees; and

(f) Granting any and all other relief which this Court deems just and proper.

Respectfully submitted this the 9th day of December, 2020,

                              **WOMBLE BOND DICKINSON (US) LLP**


                                _s/  Russ Ferguson_
                              Russ Ferguson (N.C. Bar No. 39671)
                              301 S. College Street, Suite 3500
                              Charlotte, NC 28202
                              Phone: (704) 331-4920
                              Email: Russ.Ferguson@wbd-us.com

                              Bradley A. Hoppe, Esq.*
                              Jessica L. Copeland, Esq.*
                              **BOND, SCHOENECK & KING, PLLC**
                              Avant Building, Suite 900
                              200 Delaware Avenue
                              Buffalo, New York 14202-2292
                              Phone: (716) 416-7000
                              Email: bhoppe@bsk.com
                              Email: jcopeland@bsk.com

                               * Admitted *pro hac vice*

                              *Attorneys for Plaintiffs PCT, LTD and*
                              *Paradigm Convergence Technologies,*
                              *Corporation and Third-Party Defendant*
                              *Darryl Leslie Patterson*